1

2

3

4

5

6

7

8 **IN THE UNITED STATES DISTRICT COURT**

9 **FOR THE EASTERN DISTRICT OF CALIFORNIA**

10

11 JIMMIE R. CARNES, JR.,                     No. CIV S-05-1423-CMK

12               Plaintiff,

13        vs.                                  MEMORANDUM OPINION AND ORDER

14 JO ANNE B. BARNHART,
   Commissioner of Social Security,

15               Defendant.

16 _____/

17

18          Plaintiff, who is proceeding with retained counsel, brings this action for judicial

19 review of a final decision of the Commissioner of Social Security pursuant to 42 U.S.C. §

20 405(g).  Pursuant to the consent of the parties, this case is before the undersigned for final

21 decision on plaintiff's motion for summary judgment (Doc. 21) and defendant's cross-motion for

22 summary judgment (Doc. 24).

23 / / /

24 / / /

25 / / /

26 / / /

# I. BACKGROUND

Plaintiff applied for disability benefits on February 22, 2002, based on disability. In his application, plaintiff claims that his impairment began on September 10, 2001.  In his brief, plaintiff claims his impairments consist of the following:

> Mr. Carnes suffers from impairments which give rise to exertional and non-exertional symptoms which combine to preclude him from performing substantial gainful activity.  Mr. Carnes' severe impairments include Dementia due to Multiple Etiologies, Bipolar Disorder mixed with psychotic features, antisocial personality disorder, asthma, large incisional hernia, colostomy bag placement, pigeon toed gait, as well as headaches. These impairments cause limitations in his ability to function on a sustained basis necessary for full-time employment at any exertional level. Mr. Carnes also has a past history of drug and alcohol abuse which, at the time of the hearing, has been in full sustained remission for two years and five months.

Plaintiff is a United States citizen born November 13, 1959, with a high school equivalency. The record also reflects that plaintiff attended special education classes from 1972 to 1974.

## A.   Summary of the Evidence

The record contains records from the California Department of Corrections (now the California Department of Corrections and Rehabilitation).    It appears that plaintiff was incarcerated during some portion of the period from August 1996 to 2000 or 2001.  A screening report from August 13, 1996, states:

> Based on this initial screening, there is not an indication that this offender is suffering from a mental illness.  Referral to a mental health professional is not indicated.

The same conclusion was reported in similar screening reports from February 24, 1997, November 24, 1997, and February 23, 1998.  None of plaintiff's incarceration records from this period reference any mental or serious health problems.

After his release, plaintiff sought treatment at Northgate Point medical clinic based on a referral by his parole officer.  The record contains the file from this provider covering the period from August 3, 2001, to July 25, 2002.  These documents indicate that plaintiff's main complaints were mood swings, sleep disturbance, racing thoughts, anger problems, and memory

problems.  Plaintiff was found to have rapid pressured speech, suicidal ideation, and tangential thinking.  Plaintiff also reported auditory hallucinations.  It was during this time period that plaintiff appears to have been first diagnosed with bipolar disorder.

In an adult disability report submitted with his application for benefits, plaintiff states that he is "unable to work in the heat" and that his "medication makes me sleep."  Plaintiff states that this is why he became unable to work.  Specifically, plaintiff states: "My doctor changed the way I take my medication and my employer terminated me but told Unemployment that I didn't show up for work; he lied."  (emphasis in original).  Finally, in a place for plaintiff to record any additional remarks, plaintiff states:

> This started around Nov. 1972.  I hide it with a lot of anger and drugs and alcohol.  I no longer drink or use drugs.  I am constily depressed and hear voices part of the time, mostly when I am stressed out.  Here lately I'm always stressed out.  No job and $140.00 mo. and I getting closer to the edge every day.  If it wasn't for my best friend and roommate I would be on the verge of a nervious break down!!  I can't seem to get a job because all applications ask if I am on medication or if I have any mental problems and as a parolee I have to list this.  So I don't get hired!  I need some help money wise, medical/wise, dental.  I'm going CRAZY!!  It seems like I get more and more depressed every minute of every hour of every day!! [sic]

In an undated daily activities questionnaire, plaintiff responded to questions about activities of daily living, social functioning, and personal information.  Plaintiff states that, on an average day, he gets up, eats, cleans up a bit, and the looks for jobs.  He states that he rides the bus to apply for jobs.  After this, he returns home, does laundry, makes dinner, does dishes, showers, and watches some television.  As to his sleep habits, plaintiff states that, sometimes he tosses and turns all night, and other times he sleeps "sound as a baby."  Plaintiff says that he does not have difficulty grooming, although he states that he sometimes showers only every other day.  He states that he takes turns with his roommate cooking meals.  He states that his roommate does the shopping, but that he mops the floor, vacuums, dusts, and cleans.  Plaintiff states that he does not need any help with these tasks.  As to social functioning, plaintiff states

that he goes out of his house every day and that he walks and rides the bus.  He says he has no

difficulty with these activities.  Plaintiff states that his best friend and her children have

"adopted" him into their family and that they get along great.  It does not appear that plaintiff

speaks with his own relatives.  Plaintiff states that he gets along "great" with co-workers.  He

says that he likes to play pool and "surf the internet."  He also states that, since his condition

began, he does not go out to bars or dancing.  As to personal information , plaintiff states that he

has trouble concentrating and finishing tasks.  He also states that he cannot get hot or overheated

due to his medications.  Finally, other than having to re-read them, he states that he does not

have trouble following written instructions.

On March 14, 2002, plaintiff's friend, Michelle Cavanaugh, submitted a daily

activities questionnaire concerning plaintiff's abilities.  Ms. Cavanaugh states that, on a typical

day, plaintiff makes breakfast, cleans up, looks for a job, does laundry, cooks dinner, and

watches television.  She states that plaintiff normally sleeps from 9:00 p.m. to 6:00 a.m. and that

he does not have any difficulty sleeping.  Ms. Cavanaugh also states that plaintiff has no

difficulty caring for his personal needs and grooming.  She states that plaintiff shops twice a

week without assistance.  Ms. Cavanaugh states that plaintiff goes out of the house daily, also

without assistance.  She states that plaintiff rides a bike.  She also states that plaintiff does not

have any difficulty getting along with others.  Finally, Ms. Cavanaugh states that plaintiff does

not have any difficulty concentrating, remembering, finishing tasks, or following instructions.

On August 16, 2002, another friend, Kimberly Buchanan, submitted a daily

activities questionnaire.  Ms. Buchanan paints a different picture of plaintiff's capabilities.  As to

plaintiff's typical day, Ms. Buchanan states:

> Generally he spends the day getting more and more depressed and stressed
> out.  Since he can't do the things he used to do he gets frustrated very
> easily.  Therefore, he has more time to think about the things that he
> doesn't have.  He stresses that he doesn't have any money, and that he
> can't concentrate on any one thing long enough to complete very many
> tasks.

1   Concerning plaintiff's sleep patterns, she states:

2           He sleeps on and off throughout the day.  He goes to sleep for the night at
            around 10:30 p.m.  He frequently wakes up at night and has a hard time
3           getting himself to fall back to sleep.

4   She also states: "He has a hard time falling asleep and has a hard time staying asleep for more

5   than a few hours at a time."  As to plaintiff's ability to care for himself, Ms. Buchanan states that

6   "[h]e is capable of caring for himself," and adds "[h]e just has no way of paying for the things

7   necessary to care for himself."  When asked whether anyone helps plaintiff prepare meals, she

8   states: "No.  He can make his own meals,  he just can't afford to buy the food to make them

9   with."  With respect to household chores, Ms. Buchanan states that plaintiff can do "[a]ll

10  household chores," but adds that plaintiff ". . . has to stop frequently so he doesn't get too hot."

11  She also states that plaintiff loses his concentration easily and occasionally needs someone to

12  remind him what he was doing.  As to plaintiff's social functioning, Ms. Buchanan states:

13          He thinks that everyone is out to get him.  He is paranoid of what people
            think.  He doesn't trust people.  He loses his temper and gets upset
14          because he can't control the thoughts going through his head about the
            people around him.
15

16  Finally, Ms. Buchanan states that plaintiff watches her children on Saturday nights and that,

17  during that time, they are completely dependent on plaintiff.

18          On September 30, 2002, agency physician Rajinder Randhawa, M.D., performed

19  a comprehensive psychiatric evaluation of plaintiff and submitted a report.  As to his chief

20  complaint, Dr. Randhawa states that plaintiff reported the following: "I'm nervous as hell just

21  coming to this appointment.  I'm trying to get some help financially.  I'm in a very tight spot."

22  As to plaintiff's social functioning, Dr. Randhawa opined:

23          He is not isolative, delusional, or phobic in any respect.  He is able to
            socialize with his family and friends adequately.  He does not attend any
24          groups or church at present.  He is able to spend quality time with this
            family and also with his friends without any compromise.  He is able to
25          relate to the examiner in a polite, respectful, and calm manner.

26  / / /

                                                5

As to concentration, persistence, and pace, Dr. Randhawa stated:

> He is able to focus and concentrate during the entirety of the assessment on today's evaluation.  He also has the capability of concentrating to read a book that he likes 2-3 times a day.  His primary hobby is watching television or doing some yard work that he is currently involved in.

Finally, Dr. Randhawa offered the following functional assessments:

> 1.    The claimant has adequate multiplication skills and appears to be capable of managing his funds especially when he claims at present that he is drug free;
>
> 2.    The claimant has the ability to comprehend simple, detailed, and complex instructions, and can carry on such tasks without any psychiatric compromise;
>
> 3.    The claimant can accept instructions from supervisors and also can interact with co-workers and public without any difficulty;
>
> 4.    The claimant should be able to perform work activities on a consistent basis, as he is performing his daily routine at his girlfriend's mother's place where he lives and where he does significant yard work and other chores around the house; and
>
> 5.    The claimant should be able to maintain regular attendance in the workplace but needs initial training in order to obtain and sustain in a work like place since he has not had significant work history.  He should be able to complete a normal workday and workweek after such a training without any interruption from his psychiatric condition.  He should also be able to deal with the usual stress that is commonly encountered in a workplace.[1]

On October 8, 2002, agency physician Calvin R. Nash, M.D., an orthopedic surgeon, submitted a report following his examination of plaintiff.  At the time of his examination, plaintiff denied any serious medical disease other than "gas."  Plaintiff also reported that he is bipolar and that he has undergone some kind of psychiatric treatment all his life.  Plaintiff stated, however, that he did not know why he was being examined because he has no medical complaints.  The examination was unremarkable and Dr. Nash offered the following

---

[1]    Although Dr. Randhawa uses the phrase "psychiatric condition" here, earlier in his report he states that plaintiff "does not appear to be experiencing any significant psychiatric symptomatology that is impairing his ability to be gainfully employed."

1   opinion:

2           This man has no evidence of orthopedic abnormality.  He has no
            complaints and denies any injuries or restrictions regarding his
3           musculoskeletal system.  He may work at whatever job he so selects.  He
            needs no restriction as far as time or activity level is concerned.
4

5           On October 30, 2002, agency physician Lon Gottschalk, M..D., submitted a

6   mental residual functional capacity assessment based on his review of the medical records.   Dr.

7   Gottschalk also submitted a psychiatric review technique form.  Dr. Gottschalk assessed plaintiff

8   as not being significantly impaired in most respects.  He did, however, opine that plaintiff was at

9   most moderately impaired[2] with respect to his ability to do the following: (1) carry out detailed

10  instructions; (2) maintain attention and concentration for extended periods of time; (3) sustain an

11  ordinary routine without special supervision; (4) work in coordination with others without being

12  distracted by them; (5) complete a normal workday and workweek without interruptions from

13  psychologically based symptoms; and (6) interact appropriately with the public.  Dr. Gottschalk

14  assessed plaintiff as moderately limited with respect to his ability to: (1) accept instructions and

15  respond appropriately to criticism; and (2) perform activities within a schedule and maintain

16  regular punctual attendance.

17          Plaintiff was incarcerated again from October or November 2002 through April

18  2003.  Medical interview notes from December 27, 2002, reference bipolar disorder.  Records

19  from January 7, 2003, show that plaintiff had a major mental illness requiring continued

20  placement in a special program called CCCMS.  Staff psychologist consultation notes from

21  March 6, 2003, indicate that plaintiff complained of depression for which he was taking Lithium.

22  Other notes from this consultation indicate complaints consistent with bipolar disorder.

23  / / /

24  / / /

25  ────────────────────

26          [2]      To indicate this, Dr. Gottschalk marked both boxes for "Not Significantly
        Limited" and "Moderately Limited" and connected the two boxes with arrows.

The record contains the medical file from U.C. Davis Medical Center for the period from August 27, 2003, to November 25, 2003. Inpatient notes from August 28, 2003, indicate that plaintiff ". . . inserted a toothbrush holder into his rectum . . . on 8/27/03," which he was unable to remove. On August 28, 2003, plaintiff underwent surgery for removal of the foreign object and to repair a rectal tear. A colostomy bag was inserted as part of this procedure. Following his surgery, plaintiff was assessed a temporary limitation (six to eight weeks) for heavy lifting and directed to return for follow-up examination in a week. As of November 13, 2003, plaintiff reported that he was doing well. On November 25, 2003, plaintiff was directed to return in May 2004 for a "colostomy takedown."

Plaintiff again sought treatment from Northgate Point from March 2003 through September 2004. Psychiatric progress notes from March 18, 2003, indicate the following:

> [Patient] comes in immediately said that he needs to come in more often. He has been feeling very stressed with things going on in the house that he lives. Apparently a fence had fallen over in a storm and he is not able to repair it because of the lifting limitations that he is under because of his abdominal hernia. States he is sleeping less because of stress. Tolerating medication well, denies side effects. He is in the process of getting SSI but is having problems finding his attorney. [Patient] brought in form to fill out for the disability process. This was filled out. [sic]

The same progress notes indicate a diagnosis of bipolar disorder and that malingering needs to be ruled out. Progress notes from April 29, 2003, state:

> [Patient] states that he just found out that he needs to refile his SSI paper work and feels defeated at this point regarding his SSI and feels that he is a burden to his girlfriend and her family because he can't contribute to the household with finances or help with chores. . . . He is also having trouble sleeping and reports trouble getting an erection. . . .

These notes conclude with an assessment of bipolar disorder and "[m]ultiple social stressors, including trouble attaining SSI." In June 2004, a report was prepared concerning plaintiff's progress. The ALJ accurately summarized this report in the hearing decision as follows:

> . . . He . . . underwent an annual assessment in June 2004. At that time, the claimant reported that he had only "a little" trouble managing day to day life, household activities, recreational activities, getting along with

others, making and keeping friends, feeling depressed or anxious, or
experiencing mood swings.  He reported no problems with adjusting to
major stress, being independent, or concentrating.  He reported no
memory problems, hallucinations, or problems feeling satisfied with life.
He reported having a lot of trouble with being realistic about himself and
others, applying for public assistance, experiencing physical disorders,
and experiencing manic or bizarre behaviors.  He reported no current
illegal substance abuse or alcohol abuse.  Mental status examination
findings showed that he was clean, made good eye contact, was fully
oriented, had normal affect, and normal thought content.  His thinking was
somewhat circumstantial, but memory and concentration were intact.  The
examiner concluded that the claimant continued to require mental health
services.

Plaintiff was seen again on July 22, 2004.  Notes from this visit state:

[Patient] reports that he is having a lot of difficulty coping with everyday
problems recently. . . .  He is embarrassed by his colostomy bag and his
large abdominal hernia and states that he has been feeling depressed about
this for the last several days. . . .  Does not report any manic or psychotic
symptoms. . . .  States that he did receive some good news few days ago
that his SSI will start in the next few months and it very hopeful about
that.

Agency psychologist Janice Nakagawa, Ph.D., examined plaintiff on February 8,

2005, and submitted a report on February 11, 2005.  Dr. Nakagawa noted that, throughout

plaintiff's medical record, there is a consistent assessment of "Bipolar Disorder, Unspecified,

with Psychotic Features in the past as well as Polysubstance Dependence and Antisocial

Personality Disorder."  At the time of the examination, plaintiff reported prostate problems and

gastroesophageal reflux disease.  Plaintiff also reported a significant history of legal problems.

Plaintiff stated that he used methamphetamine 20 years prior and had stopped about a year and a

half before the examination (i.e., sometime in 2003).  Plaintiff also reported:

. . . As an adult, most of his arrests and convictions were related to his
drug use.  He went to prison for drug use in the 1990s but was not sure
exactly when.  He had multiple parole violations, "a lot."  His last arrest
had been "a long time" and could not remember when.

In her report, Dr. Nakagawa diagnosed plaintiff with "Dementia due to Multiple Etiologies;

Polysubstance Dependence, in remission (alcohol and methamphetamine); Reported Bipolar

Disorder, Mixed, with Psychotic Features, by history."  Finally, Dr. Nakagawa offered the

following summary and impressions:

> Claimant is a 45-year-old, divorced, Caucasian male who has a very
> limited work history.  He had problems with methamphetamine
> dependence.  He claims he quit using drugs a year and a half to two years
> ago.  He sees a psychiatrist at a local county mental health center.  He is
> being maintained on mood stabilizers, antidepressants, and antipsychotic
> medications.  Diagnosis was Bipolar Disorder with Psychotic Features.
> He began hearing voices at age 13.  He has had chronic problems related
> to psychosocial adjustment.  Present testing indicates he functions overall
> in the extremely low range with extremely low verbal and nonverbal
> skills.  Screening measures indicate brain damage.  He has a memory
> problem.  Premorbid level of intellectual functioning is probably in the
> borderline range.
>
> He would likely have difficulty completing even simple job instructions.
> He would have difficulty dealing with the public, and with co-workers and
> supervisors unless in a supportive work environment.  He would have
> difficulty coping with changes in routines.  He could cope with general
> routines if not changed at all.  He merits a diagnosis of Dementia due to
> Multiple Etiologies.  He clearly has troublesome character dynamics that
> have created past difficulties for him.

On February 19, 2005, state agency physician Satish Sharma, M.D., submitted a

report following his physical examination of plaintiff.  Dr. Sharma's report notes that plaintiff

reported the following ailments: history of asthma since childhood; history of cough, off and on;

history of recurrent headaches; Osgood-Slaughter disease in both knees; problems with his feet;

pigeon toes; rectal injury with colostomy placement in 2003; and history of bipolar disorder.  Dr.

Sharma's physical examination was unremarkable.  In particular, his report does not note any

physical abnormalities, other than the colostomy bag placement and related incisional hernia.

Objectively, Dr. Sharma also noted that plaintiff has a pigeon-toed gait.  As to plaintiff's

physical capabilities, Dr. Sharma opined that plaintiff can occasionally lift and carry 20 pounds

and frequently lift and carry 10 pounds.  He also opined that plaintiff can stand and/or walk for

six hours in an eight-hour day.  Dr. Sharma opined that plaintiff is limited with respect to his

ability to push/pull.[3]  Dr. Sharma opined no limitations for sitting.  He also opined that plaintiff had no manipulative, visual, or communicative limitations.  As to climbing, balancing, kneeling, crouching, crawling, and stooping, Dr. Sharma opined that plaintiff can do each of these postural activities occasionally.  For environmental limitations, Dr. Sharma was of the opinion that plaintiff was unlimited with respect to temperature extremes, noise, humidity, and workplace hazards, but that plaintiff should avoid contact with workplace dust, fumes, chemicals, and odors.

**B.**   **Procedural History**

Plaintiff's claim was initially denied.  Following denial of his request for reconsideration, plaintiff requested an administrative hearing, which was held on January 11, 2005, before Administrative Law Judge ("ALJ") Antonio Acevedo-Torres.

In his April 14, 2005, decision, the ALJ made the following findings:

1.    The claimant meets the nondisability requirements for a period of disability and Disability Insurance Benefits . . . and is insured for benefits through December 31, 2002;

2.    The claimant has not engaged in substantial gainful activity since the alleged onset of disability;

3.    The claimant has an impairment or combination of impairments that is severe based on the requirements in the Regulations . . .;

4.    These medically determinable impairments do not meet or medically equal one of the listed impairments in [the Listing of Impairments] . . .;

5.    The undersigned finds the claimant's allegations regarding his limitations are not totally credible for the reasons set forth in the body of the decision;

6.    The claimant has the following residual functional capacity: non-complex, light work (lifting 20 pounds occasionally or 10 pounds frequently) with no more than occasional climbing, balancing, stooping, kneeling, crouching, or crawling; he should avoid extended exposure to highly concentrated levels of respiratory irritants;

7.    The claimant's past relevant work as a driver, shop manager, deli worker,

---

[3]    Dr. Sharma does not indicate whether this limitation applies to plaintiff's upper or lower extremities.  He states that the limitation is the "same as lifting carrying."

and greens keeper did not require the performance of work-related activities precluded by his residual functional capacity;

8.    The claimant's impairments do not prevent the claimant from performing his past relevant work; in the alternative, Rule 202.21, Table No. 2 of Appendix 2, Subpart P, Regulations No. 4, direct[s] a conclusion that the claimant is not disabled because a significant number of jobs exist that he can perform; the claimant's occasionally postural limitations and environmental limitations would not significantly erode the base of light work (Social Security Rulings 83-10, 83-14, and 85-15); and

9.    The claimant was not under a disability . . . at any time through the date of the decision . . .

Based on these findings, the ALJ concluded that plaintiff was not disabled and, therefore, not entitled to benefits. After the Appeals Council declined review on June 29, 2005, this appeal followed.

## II.  STANDARD OF REVIEW

The court reviews the Commissioner's final decision to determine whether it is: (1) based on proper legal standards; and (2) supported by substantial evidence in the record as a whole. See Tackett v. Apfel, 180 F.3d 1094, 1097 (9th Cir. 1999). "Substantial evidence" is more than a mere scintilla, but less than a preponderance. See Saelee v. Chater, 94 F.3d 520, 521 (9th Cir. 1996). It is ". . . such evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 402 (1971). The record as a whole, including both the evidence that supports and detracts from the Commissioner's conclusion, must be considered and weighed. See Howard v. Heckler, 782 F.2d 1484, 1487 (9th Cir. 1986); Jones v. Heckler, 760 F.2d 993, 995 (9th Cir. 1985). The court may not affirm the Commissioner's decision simply by isolating a specific quantum of supporting evidence. See Hammock v. Bowen, 879 F.2d 498, 501 (9th Cir. 1989). If substantial evidence supports the administrative findings, or if there is conflicting evidence supporting a particular finding, the finding of the Commissioner is conclusive. See Sprague v. Bowen, 812 F.2d 1226, 1229-30 (9th

Cir. 1987).  Therefore, where the evidence is susceptible to more than one rational interpretation, one of which supports the Commissioner's decision, the decision must be affirmed, see Thomas v. Barnhart, 278 F.3d 947, 954 (9th Cir. 2002), and may be set aside only if an improper legal standard was applied in weighing the evidence, see Burkhart v. Bowen, 856 F.2d 1335, 1338 (9th Cir. 1988).

## III.  DISCUSSION

In his motion for summary judgment, plaintiff argues that: (1) the ALJ failed to properly evaluate the medical opinions; (2) the ALJ improperly discredited his testimony as not credible; (3) the ALJ failed to properly apply the Listing of Impairments; and (4) the ALJ improperly applied the Grids in lieu of obtaining vocational expert testimony.

### A.    Medical Opinions

The weight given to medical opinions depends in part on whether they are proffered by treating, examining, or non-examining professionals.  See Lester v. Chater, 81 F.3d 821, 830-31 (9th Cir. 1995).  Ordinarily, more weight is given to the opinion of a treating professional, who has a greater opportunity to know and observe the patient as an individual, than the opinion of a non-treating professional.  See id.; Smolen v. Chater, 80 F.3d 1273, 1285 (9th Cir. 1996); Winans v. Bowen, 853 F.2d 643, 647 (9th Cir. 1987).  The least weight is given to the opinion of a non-examining professional.  See Pitzer v. Sullivan, 908 F.2d 502, 506 & n.4 (9th Cir. 1990).

In addition to considering its source, to evaluate whether the Commissioner properly rejected a medical opinion the court considers whether:  (1) contradictory opinions are in the record; and (2) clinical findings support the opinions.  The Commissioner may reject an uncontradicted opinion of a treating or examining medical professional only for "clear and convincing" reasons supported by substantial evidence in the record.  See Lester, 81 F.3d at 831. While a treating professional's opinion generally is accorded superior weight, if it is contradicted

13

by an examining professional's opinion which is supported by different independent clinical findings, the Commissioner may resolve the conflict. See Andrews v. Shalala, 53 F.3d 1035, 1041 (9th Cir. 1995). A contradicted opinion of a treating or examining professional may be rejected only for "specific and legitimate" reasons supported by substantial evidence. See Lester, 81 F.3d at 830. This test is met if the Commissioner sets out a detailed and thorough summary of the facts and conflicting clinical evidence, states her interpretation of the evidence, and makes a finding. See Magallanes v. Bowen, 881 F.2d 747, 751-55 (9th Cir. 1989). Absent specific and legitimate reasons, the Commissioner must defer to the opinion of a treating or examining professional. See Lester, 81 F.3d at 830-31. The opinion of a non-examining professional, without other evidence, is insufficient to reject the opinion of a treating or examining professional. See id. at 831. In any event, the Commissioner need not give weight to any conclusory opinion supported by minimal clinical findings. See Meanel v. Apfel, 172 F.3d 1111, 1113 (9th Cir. 1999) (rejecting treating physician's conclusory, minimally supported opinion); see also Magallanes, 881 F.2d at 751.

Plaintiff argues: "The ALJ failed to credit the opinions of his treating providers at Northgate Point; failed to credit the opinion of Dr. Nakagawa; and, failed to accurately reflect the limitations noted by Dr. Sharma." Plaintiff also argues that the ALJ improperly "rejected the 'social limitations assessed by Disability Service sources.'"[4]

1.   Northgate Point

As to the Northgate Point records, the ALJ stated:

On August 9, 2001, upon referral from his parole officer, the claimant sought mental health treatment at Northgate Point. His chief complaints were mood swings, sleep disturbances, racing thoughts, anger problems, and memory deficits. He said that he last used methamphetamine more than two years earlier. He was living with his friends, but spent most of his time with his girlfriend and her children. Mental status examination findings showed that the claimant was sloppily dressed, with fair hygiene.

---

[4]   Here, plaintiff's brief quotes the hearing decision. The ALJ's citation to Disability Service sources refers to Dr. Gottschalk's opinion.

1
2
3

> He had increased psychomotor activity, rapid pressured speech, and suicidal ideation. He said that he experiences auditory hallucinations. He was generally oriented, but his thinking was somewhat tangential. The examiner diagnosed bipolar disorder with psychotic symptoms. He was placed on [medication].

4
5
6
7
8
9

> In September 2001, the claimant reported that he still had mood swings and a chaotic lifestyle, but he was doing somewhat better on medication. His medication was increased and an antidepressant was added. The claimant did not keep appointments scheduled in October 2001 and January 2002. He was seen in March 2002 and reported continued chaos in his life. He said that he was recently arrested for possession, but he externalized the blame. The examiner noted that he was poorly compliant. He was diagnosed as having a bipolar disorder, mixed personality disorder, and polysubstance abuse disorder, reportedly in remission. He was again placed on medication. He did not keep his May 2002 appointment.

10   As summarized above, the ALJ also discussed the Northgate Point June 2004 assessment.  Later

11   in the hearing decision, the ALJ added:

12
13

> . . . None of the claimant's treating sources noted any significant intellectual or cognitive limitations. They did not refer the claimant for testing due to any noted cognitive disorder. In June 2003, the claimant said he had no problem with memory or concentration.

14

15   Plaintiff argues that "the ALJ ignored and thereby rejected the opinions of Mr. Carnes' treating

16   health providers at Northgate Point who assessed him with Bipolar disorder mixed with

17   psychotic features, an[d] antisocial personality disorder . . . in 2004."[5]

18            Given the ALJ's lengthy discussion of the Northgate Point records, plaintiff is

19   simply incorrect in his assertion that the ALJ ignored this evidence.  More to the point, with

20   respect to plaintiff's contention that the ALJ either failed to acknowledge or improperly rejected

21   the Northgate Point diagnosis of bipolar disorder and personality disorder, the ALJ found:

22
23

> The medical evidence indicates that the claimant has . . . bipolar disorder, a personality disorder, [and] possible mild dementia, . . . impairments that are "severe" within the meaning of the Regulations . . . .

24   Therefore, it is clear that, not only did the ALJ thoroughly discuss the Northgate Point records,

25   _____

26            [5]      Plaintiff does not challenge the ALJ's summary of the Northgate Point records, which the court finds to be accurate.

he accepted the diagnosis reported in those records.  Plaintiff's argument concerning the ALJ's

consideration of these records is without merit.

        2.   <u>Dr. Nakagawa</u>

As to Dr. Nakagawa, the ALJ stated:

> In February 2005, the claimant underwent a psychological consultative
> examination by Janice Nakagawa, Ph.D.  His chief complaints were
> memory problems, depression, and nervousness.  He stated that he quit
> using methamphetamine one and half years earlier.  He said that his
> activities of daily living were limited.  He stated that his girlfriend
> prepared all of this meals.  He worked on word puzzles, watched
> television, played cards, and took naps during the day.  He reported no
> interests or hobbies.  Mental status examination findings show that the
> claimant was fully oriented.  He appeared nervous.  His speech was
> normal.  He could only remember three digits forward and two backward.
> IQ testing revealed a verbal score of 61, performance score of 63, and full
> scale score of 59.  Bender gestalt testing suggested possible brain damage.
> Dr. Nakagawa diagnosed dementia and a personality disorder . . . .  She
> rated global functioning at 60, denoting mild to moderate functional
> limitations.  She said that he would likely have difficulty completing even
> simple job instructions (although she assessed only light limitations in this
> area of functioning).  She said that he would have difficulty interacting
> with the public and coworkers, although she assessed only slight
> limitation in getting along with coworkers and moderate limitations
> interacting with the public.  She stated that the claimant was markedly
> limited in his ability to respond appropriately to work pressures or
> changes in routine work setting.

The ALJ then discussed Dr. Nakagawa's opinion at length.  As to Dr. Nakagawa's opinion

concerning plaintiff's social functioning, the ALJ stated:

> The claimant's social functioning must also be considered.  Dr. Nakagawa
> said that the claimant would have difficulty interacting with the public and
> co-workers, but she assessed only slight limitations in getting along with
> co-workers and moderate limitation interacting with the public.  Dr.
> Randhawa concluded that the claimant could interact appropriately with
> others in the workplace, including the public.  The claimant has alleged
> that he is estranged from his family.  However, he continues to remain in
> contact with some relatives.  In addition, he has several friends that he
> sees on a regular basis, including a girlfriend.  He has often lived with
> friends and their other family members.  He gets along with the children
> of his girlfriend.  The claimant testified that he has hallucinations that
> make him fight with people.  However, there is no support for this
> statement anywhere in the treatment records.  Treatment records show that
> the claimant was polite and his socialization skills were adequate.  He
> made good eye contact and was generally not aggressive or angry.  In June

2004, the claimant stated that he had no more than a little problem getting along with others or keeping friends.  The claimant uses public transportation and goes shopping and interacts with the public without any evidence of difficulty in this area.  It is concluded that the claimant has no more than mild difficulties in maintaining social functioning.

As to plaintiff's ability to maintain concentration, persistence, and pace, the ALJ stated:

The claimant's ability to maintain concentration, persistence, and pace must also be considered.  The claimant has alleged that he has a diminished ability to sustain concentration and decreased memory.  Dr. Nakagawa performed testing and concluded that he suffered from dementia with severely reduced intelligence levels.  She stated that the claimant would have difficulty completing even simple job tasks. However, this assessment of the claimant's functioning is rejected because it is inconsistent with all of the other evidence of record, including the claimant's own statements regarding his daily functioning.  Dr. Randhawa noted that the claimant was able to perform serial 7s and a three-step task. He concluded that the claimant could perform complex, detailed, or simple tasks.  None of the claimant's treating sources noted any significant intellectual or cognitive limitations.  They did not refer the claimant for testing due to any noted cognitive disorder.  In June 2004, the claimant said he had no problem with memory or concentration. Moreover, the claimant's activities of daily living show that he uses the internet, reads books, shops, take[s] public transportation, works word puzzles, plays cards, and watches movies.  These activities require a level of intellectual functioning and concentration that belie the extreme limitations assessed by Dr. Nakagawa.  It is concluded that the claimant has no more than mild to moderate limitations in maintaining concentration, persistence, or pace.

Plaintiff argues that the ALJ improperly failed to credit Dr. Nakagawa's opinion.  Specifically, plaintiff argues that the ALJ's reason – that Dr. Nakagawa's opinion is inconsistent with the clinical findings of record as well as evidence of plaintiff's daily functioning – is "totally at odds with the actual record before this court."  Plaintiff does not, however, offer any actual argument in support of his position.

In any event, the court disagrees with plaintiff's conclusory contention that this particular reason is not supported by the record as a whole.  To the contrary, and as the ALJ clearly outlined in the hearing decision, the finding is completely consistent with Dr. Randhawa's assessment and the evidence of record concerning plaintiff's daily activities.  As to the latter, the court notes the daily activities questionnaires submitted by plaintiff and his friend,

17

1   Ms. Cavanaugh, as well as his statements in June 2004 at Northgate Point.  These statements are

2   consistent with the ALJ's finding that plaintiff has a "level of intellectual functioning and

3   concentration that belie the extreme limitations assessed by Dr. Nakagawa."[6]

4                   3.      Dr. Gottschalk

5               As with Dr. Nakagawa, plaintiff makes the conclusory statement that the ALJ

6   improperly rejected Dr. Gottschalk's opinion because the stated reason is not supported by the

7   record.  Concerning Dr. Gottschalk, the ALJ stated:

8               . . . The undersigned also finds no basis for social limitations as assessed
                by [Dr. Gottschalk] because the clinical findings and claimant's own
9               statements in the record show that he does not have significant problems
                interacting with others.

10

11  Again, the court disagrees with plaintiff's conclusory statement.  The ALJ's reason is in fact

12  supported by the record.  As discussed above, plaintiff's own statements as to his daily activities,

13  as well as those of Ms. Cavanaugh, indicate that plaintiff does not have significant social

14  limitations.  Moreover, as between Drs. Gottschalk and Randhawa – both of whom offered

15  opinions as to plaintiff's psychological capabilities – the court notes that Dr. Randhawa

16  conducted a comprehensive examination of plaintiff, whereas Dr. Gottschalk only conducted a

17  file review.   See Pitzer, 908 F.2d at 506 & n.4 (concluding that the least weight is given to the

18  opinions of non-examining professionals).

19                  4.      Dr. Sharma

20              As to Dr. Sharma, the ALJ stated:

21              The claimant underwent an internal medicine consultative examination by

22          _____

23              [6]     The court is mindful of the daily activities questionnaire submitted by Ms.
        Buchanan, which paints a starkly limited picture of plaintiff's capabilities, and which the ALJ
24      appears to have ignored.  This is not, however, a basis upon which to find error.  First, the court
        notes that plaintiff does not argue that the ALJ erred by failing to consider Ms. Buchanan's
25      statements.  In any event, the ALJ did not err by ignoring any of the lay witness statements
        because they were clearly contravened by other evidence in the record.  See Vincent on Behalf
26      of Vincent v. Heckler, 739 F.2d 1393, 1394-95 (9th Cir. 1984); see also Stout v. Commissioner,
        454 F.3d 1050, 1053-54 (9th Cir. 2006).

Satish Sharma, M.D.  He gave a history of asthma as a child, as well as recurrent headaches.  He also said that he had pain in both knees and feet. He said that he was told he had pigeon toes and that this caused pain when walking for prolonged periods.  He also said that he had a colostomy and an incisional hernia which got bigger when he bent forward or lifted something heavy.  Upon examination, Dr. Sharma noted that there was a colostomy bag in place, and a moderate sized incisional hernia.  There was no localized tenderness.  He also held his fee[t] in a slightly everted position when he walked.  He had a mild pigeon-toed gait.  All other findings were normal.  Dr. Sharma indicated that the claimant could lift 20 pounds occasionally and 10 pounds frequently.  He could stand or walk six hours in an eight-hour day.  He had no sitting limitations.  He could occasionally climb, balance, stoop, kneel, crouch, or crawl.  There were no visual, communicative, or manipulative limitations.  He indicated that the claimant had environmental limitations related to dust, fumes, odors, and gases due to his history of asthma.

The ALJ then outlined his finding as to plaintiff's physical residual functional capacity[7] and stated:

The physical limitations of the established residual functional capacity are supported by the assessments provided by Disability Determination Service sources and Dr. Sharma.

Plaintiff asserts that the ALJ failed to accurately reflect the limitations noted by Dr. Sharma because he did not include Dr. Sharma's limitations regarding lifting/carrying and pushing/pulling caused by plaintiff's hernia.

Dr. Sharma's opinion as to lifting and carrying is that plaintiff can lift and carry 20 pounds occasionally and 10 pounds frequently.  Because this is the same limitation set out in the ALJ's residual functional capacity assessment, the court rejects plaintiff's argument that the ALJ failed to include Dr. Sharma's lift/carry limitation.

As to Dr. Sharma's opinion that plaintiff is limited in his ability to push/pull, Dr.

---

[7]    As outlined above, the ALJ found that plaintiff has the following residual functional capacity:

The claimant has the following residual functional capacity: non-complex, light work (lifting 20 pounds occasionally or 10 pounds frequently) with no more than occasional climbing, balancing, stooping, kneeling, crouching, or crawling; he should avoid extended exposure to highly concentrated levels of respiratory irritants

1    Sharma stated that this limitation was the same as for lift/carry.  Therefore, the court must

2    conclude that Dr. Sharma's specific limitation for push/pull is that plaintiff can push and pull 20

3    pounds occasionally and 10 pounds frequently.  Dr. Sharma did not limit this opinion to any

4    particular extremity.  In his residual functional capacity finding, the ALJ concluded that plaintiff

5    has the exertional capability to perform light work.  Exertional capabilities are the primary

6    strength activities of sitting, standing, walking, lifting, carrying, pushing, or pulling and are

7    generally defined in terms of ability to perform sedentary, light, medium, heavy, or very heavy

8    work.  See 20 C.F.R., Part 404, Subpart P, Appendix 2, § 200.00(a).  "Light work" involves

9    lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up

10   to 10 pounds.  See 20 C.F.R. §§ 404.1567(b) and 416.967(b).  Given these regulations, the court

11   concludes that the ALJ's finding that plaintiff can perform light work necessarily includes Dr.

12   Sharma's limitation for push/pull.

13            Because the ALJ accepted Dr. Sharma's limitations for lift/carry and push/pull,

14   and included those limitations in his residual functional capacity assessment, the court rejects

15   plaintiff's argument that the ALJ erred with respect to Dr. Sharma's opinion.

16        **B.    Plaintiff's Credibility**

17            The Commissioner determines whether a disability applicant is credible, and the

18   court defers to the Commissioner's discretion if the Commissioner used the proper process and

19   provided proper reasons.  See Saelee v. Chater, 94 F.3d 520, 522 (9th Cir. 1995).  An explicit

20   credibility finding must be supported by specific, cogent reasons.  See Rashad v. Sullivan, 903

21   F.2d 1229, 1231 (9th Cir. 1990).  General findings are insufficient.  See Lester v. Chater, 81 F.3d

22   821, 834 (9th Cir. 1995).  Rather, the Commissioner must identify what testimony is not credible

23   and what evidence undermines the testimony.  See id.  Moreover, unless there is affirmative

24   evidence in the record of malingering, the Commissioner's reasons for rejecting testimony as not

25   credible must be "clear and convincing."  See id.

26            If there is objective medical evidence of an underlying impairment, the

1   Commissioner may not discredit a claimant's testimony as to the severity of symptoms merely

2   because they are unsupported by objective medical evidence.  See Bunnell v. Sullivan, 947 F.2d

3   341, 347-48 (9th Cir. 1991) (en banc).  The Commissioner may, however, consider the nature of

4   the symptoms alleged, including aggravating factors, medication, treatment, and functional

5   restrictions.  See id. at 345-47.  In weighing credibility, the Commissioner may also consider:

6   (1) the claimant's reputation for truthfulness, prior inconsistent statements, or other inconsistent

7   testimony; (2) unexplained or inadequately explained failure to seek treatment or to follow a

8   prescribed course of treatment; (3) the claimant's daily activities; (4) work records; and

9   (5) physician and third-party testimony about the nature, severity, and effect of symptoms.  See

10  Smolen v. Chater, 80 F.3d 1273, 1284 (9th Cir. 1996) (citations omitted).

11          As to plaintiff's credibility, the ALJ stated:

12          The claimant testified that he could not lift more than five to ten pounds.
            He stated that he could not stand longer than 20 minutes, sit longer than
13          30 minutes, or walk more than three blocks.  However, these limitations
            are not credible for the following reasons.  The record shows that the
14          claimant has pigeon toes, but he has had this all of his life.  There is no
            indication of a worsening of this disorder or any conclusion that it
15          significantly limits his ability to stand or walk.  The claimant has an
            incisional hernia.  After the surgery that resulted in the hernia, the
16          claimant was told not to lift over 10 pounds for six to eight weeks.
            However, this was only a temporary limitations, and subsequent
17          examiners did not assess this severe lifting restriction.  The claimant has
            received virtually no treatment for his hernia since August 2003.  There is
18          no indication of ongoing medication.  Moreover, the claimant's activities
            of daily living do not denote significant limitations in standing, walking or
19          sitting.  The claimant performs many light and sedentary activities
            including household chores, cooking, shopping, riding a bike, mowing the
20          lawn, playing pool, reading, watching movies, and surfing the internet.
            The record strongly supports a conclusion that the claimant can physically
21          perform light work with the postural and environmental limitations noted
            above.

22

23  Plaintiff argues that the ALJ improperly relied on "stale, out-of-date" questionnaires to assess his

24  credibility.  Specifically, plaintiff asserts that, after the questionnaires were submitted in 2002,

25  his "physical health had undergone a drastic change for the worse – he had undergone rectal

26  surgery, had a large incisional hernia, and was required to utilize a colostomy bag."  Plaintiff

21

1   concludes that his more recent hearing testimony accurately reflects this daily activities.

2          Here, the ALJ gave the following reasons for rejecting plaintiff's testimony that

3   his limitations are severely disabling: (1) plaintiff has pigeon toes, but he has had this condition

4   all of this life and it does not limit his ability to walk or stand; (2) the restrictions associated with

5   his hernia were temporary and his hernia does not currently limit his ability to lift; (3) plaintiff

6   has not sought treatment for his hernia since 2003; (4) plaintiff is not taking any medication for

7   physical impairments; and (5) plaintiff's activities of daily living are not consistent with severe

8   limitations.  It is apparent that the ALJ did not exclusively rely on the 2002 daily activities

9   questionnaires.[8]  As to the 2002 questionnaires, the only reference to those documents is in the

10  ALJ's fifth reason.  However, there is also more recent evidence in the record of plaintiff's daily

11  activities.  Specifically, the court notes records from Northgate Point in 2004.  The June 2004

12  Northgate Point records show that, at that time, plaintiff reported that he had only "a little"

13  trouble managing day to day life, household activities, recreational activities, getting along with

14  others, making and keeping friends, feeling depressed or anxious, or experiencing mood swings.

15  He also reported no problems with adjusting to major stress, being independent, or

16  concentrating.  Finally, plaintiff reported no memory problems, hallucinations, or problems

17  feeling satisfied with life.  Therefore, the court concludes that, contrary to plaintiff's contention,

18  the ALJ did not rely on stale evidence.

19         **C.    Application of the Listing of Impairments**

20         The Social Security Regulations "Listing of Impairments" is comprised of

21  impairments to fifteen categories of body systems that are severe enough to preclude a person

22  from performing gainful activity.  See Young v. Sullivan, 911 F.2d 180, 183-84 (9th Cir. 1990);

23  20 C.F.R. § 404.1520(d).  Conditions described in the listings are considered so severe that they

24  are presumed disabling. See 20 C.F.R. § 404.1520(d).  In meeting or equaling a listing, all the

25

26         [8]     Plaintiff only challenges the ALJ's reliance on the "stale, out-of-date"
    questionnaires.

requirements must be met.  See Key v. Heckler, 754 F.2d 1545, 1550 (9th Cir. 1985).

Listing 12.02, which governs organic mental disorders, requires that severity be established by either satisfying the requirements of both the "A criteria" and "B criteria," or satisfying the requirements of just the "C criteria."  See 20 C.F.R., Part 404, Subpart P, Appendix 1.  The "A criteria" are met by showing a loss of specific cognitive abilities and the medically documented persistence of at least one of the following: (1) disorientation to time and place; (2) memory impairment; (3) perceptual or thinking disturbances; (4) change in personality; (5) disturbance in mood; (6) emotional liability, such as explosive temper or sudden crying; or (7) loss of measured intellectual ability of at least 15 IQ points.  See id.  The "B criteria" are met if the loss of cognitive ability results in at least two of the following: (1) marked restriction of activities of daily living; (2) marked difficulties in maintaining social functioning; (3) marked difficulties in maintaining concentration, persistence, or pace; or (4) repeated episodes of decompensation.  See id.  The "C criteria" require a medically documented history of chronic mental disorder over at least two years that has caused more than a minimal limitation of ability to do basic work activities, with current medication or psychological support, and one of the following: (1) repeated episodes of decompensation, each of extended duration; (2) a residual disease process; or (3) current history of one or more years' inability to function outside a highly supportive living arrangement.  See id.

As to application of this listing, the ALJ stated:

As demonstrated by the rating of the "B" criteria, and as supported by the record as a whole, it is found that the claimant's mental impairments are severe, but do not meet or equal the requirements of a listed impairment. In addition, the severity of the claimant's impairments does not meet or equal the level of dysfunction described in the "C" criteria.  The claimant does not require a highly structured and supportive environment for adequate functioning.  He has not had repeated extended episodes of decompensation.  In addition, a minimal change in the claimant's environment would not be expected to result in deterioration in his condition or decompensation.

The claimant's representative argued that . . . Dr. Nakagawa's report supports a conclusion that a mental listing is met.  However, . . . the

23

1   undersigned has concluded that the claimant's mental impairment does not
2   meet or equal the severity requirements of a listed impairment because his
    impairments, individually or in combination, do not result in marked
    limitations in mental functioning.  Although some of the test scores show
3   significant impairment, the test scores alone are not a basis for finding a
    listing is met without corroborative clinical findings and evidence of
4   substantially reduced functioning.  Although the claimant may have some
    cognitive decline (assessed under Listing 12.02) related to past substance
5   abuse, the clinical findings and the claimant's general functioning . . . do
    not denote more than mild to moderate cognitive deficits.

6
    It is noted that Listing 12.05C is not applicable to this case because that
7   listing refers to developmental mental retardation, and the record does not
    support a conclusion that the claimant had mental retardation from before
8   the age of 22.  The claimant got a GED, worked in semi-skilled jobs, and
    was in the military service.  These factors do not support a finding of
9   mental retardation.

10  Plaintiff argues that the ALJ erred in concluding that his mental impairment failed to meet or

11  medically equal Listing 12.02.  He attributes this error to improper reliance on outdated daily

12  activities questionnaires and improper consideration of Dr. Nakagawa's opinion.  In particular,

13  plaintiff states that, had the ALJ considered plaintiff's current daily activities and all the

14  limitations opined by Dr. Nakagawa, he could have only concluded that Listing 12.02 was met.

15          As with plaintiff's credibility, the ALJ references plaintiff's "general functioning"

16  as a reason to conclude that Listing 12.02 does not apply.  And as with plaintiff's credibility,

17  there is evidence of plaintiff's general functioning from June 2004.  Therefore, the ALJ did not

18  rely exclusively on stale evidence of plaintiff's daily activities.   In addition, for the reasons

19  discussed above, the ALJ did not err in discounting Dr. Nakagawa's opinion.

20          A review of the evidence shows that the ALJ's decision is correct – plaintiff

21  simply cannot meet the requirements of Listing 12.02.  To meet this listing, plaintiff must meet

22  both the A and B criteria, or just the C criteria.  Turning first to the C criteria, even assuming that

23  the evidence establishes a medically documented history of chronic mental disorder over at least

24  two years that has caused more than a minimal limitation of ability to do basic work activities,

25  with current medication or psychological support, the evidence does not show the existence of

26  one of the additional elements.  There is no evidence of decompensation; there is no evidence of

a residual disease process; and there is no evidence of inability to function outside a highly supportive environment.  With respect to the A and B criteria, even assuming that plaintiff can establish the A criteria, the evidence does not establish any of the B criteria.  Again, there is no evidence of decompensation.  Moreover, while plaintiff may have some difficulties with daily activities, maintaining social functioning, and maintaining concentration, persistence, or pace, the evidence does not establish that any of these limitations are "marked."

### D.  Application of the Grids

The Medical-Vocational Guidelines ("Grids") provide a uniform conclusion about disability for various combinations of age, education, previous work experience, and residual functional capacity.  The Grids allow the Commissioner to streamline the administrative process and encourage uniform treatment of claims based on the number of jobs in the national economy for any given category of residual functioning capacity.  See Heckler v. Campbell, 461 U.S. 458, 460-62 (1983) (discussing creation and purpose of the Grids).

The Commissioner may apply the Grids in lieu of taking the testimony of a vocational expert only when the grids accurately and completely describe the claimant's abilities and limitations.  See Jones v. Heckler, 760 F.2d 993, 998 (9th Cir. 1985); see also Heckler v. Campbell, 461 U.S. 458, 462 n.5 (1983).  Thus, the Commissioner generally may not rely on the Grids if a claimant suffers from non-exertional limitations because the Grids are based on strength factors only.  See 20 C.F.R., Part 404, Subpart P, Appendix 2, § 200.00(b).  "If a claimant has an impairment that limits his or her ability to work without directly affecting his or her strength, the claimant is said to have non-exertional . . . limitations that are not covered by the Grids."  Penny v. Sullivan, 2 F.3d 953, 958 (9th Cir. 1993) (citing 20 C.F.R., Part 404, Subpart P, Appendix 2, § 200.00(d), (e)).  The Commissioner may, however, rely on the Grids even when a claimant has combined exertional and non-exertional limitations, if non-exertional limitations do not impact the claimant's exertional capabilities.  See Bates v. Sullivan, 894 F.2d 1059, 1063 (9th Cir. 1990); Polny v. Bowen, 864 F.2d 661, 663-64 (9th Cir. 1988).

1          In cases where the Grids are not fully applicable, the ALJ may meet his burden

2   under step five of the sequential analysis by propounding to a vocational expert hypothetical

3   questions based on medical assumptions, supported by substantial evidence, that reflect all the

4   plaintiff's limitations.  See Roberts v. Shalala, 66 F.3d 179, 184 (9th Cir. 1995).  Specifically,

5   where the Grids are inapplicable because plaintiff has sufficient non-exertional limitations, the

6   ALJ is required to obtain vocational expert testimony.  See Burkhart v. Bowen, 587 F.2d 1335,

7   1341 (9th Cir. 1988).

8          Here, the ALJ relied on the Grids to conclude that there are a significant number

9   of jobs that plaintiff can do given his residual functional capacity.[9]  Plaintiff argues that the ALJ

10  erred in relying on the Grids because "the ALJ failed to adequately assess how Mr. Carnes'

11  nonexertional mental impairments and symptoms would impede his ability to perform sustained

12  work activity on a regular and continuing basis."  Plaintiff attributes this error to: (1) improper

13  consideration of Dr. Nakagawa's opinion; (2) improper consideration of Northgate Point records;

14  and (3) improper credibility finding.  As discussed above, however, the court concludes that the

15  ALJ did not err in any of these respects.  Specifically, the records does not support a conclusion

16  that plaintiff has non-exertional limitations which would preclude application of the Grids.

17  / / /

18  / / /

19  / / /

20  / / /

21  / / /

22

23          [9]     The ALJ relied on the Grids in the alternative.  His initial finding was that, given
    plaintiff's residual functional capacity for light work, plaintiff could perform his past relevant
24  work.  Only in the alternative did the ALJ also find that, based on the Grids, there are other light
    jobs in the national economy that plaintiff can do.  Plaintiff does not directly challenge the ALJ's
25  finding that he can perform his past relevant work.  To the extent he challenges this finding
    through his other arguments regarding consideration of the medical evidence and his credibility,
26  the court finds no error as to those issues.

1

## IV.  CONCLUSION

Based on the foregoing, the court concludes that the Commissioner's final decision is based on substantial evidence and proper legal analysis.  Accordingly, IT IS HEREBY ORDERED that:

        1.      Plaintiff's motion for summary judgment is denied;

        2.      Defendant's cross-motion for summary judgment is granted; and

        3.      The Clerk of the Court is directed to enter judgment and close this file.

DATED:   October 19, 2006.

 

**CRAIG M. KELLISON**
UNITED STATES MAGISTRATE JUDGE